# In the United States Court of Federal Claims

No. 11-374L[*]
(Filed: November 20, 2014)
OPINION ORIGINALLY FILED UNDER SEAL ON OCTOBER 20, 2014

|  |  |  |
|---|---|---|
| ROMANOFF EQUITIES, INC., | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) ) | Summary Judgment; Rails to Trails; Scope of Easement; Abandonment; New York Law |
| THE UNITED STATES, | ) ) |  |
| Defendant. | ) ) |  |

*Mark F. ("Thor") Hearne, II*, Clayton, Missouri, for plaintiffs. *Meghan S. Largent* and *Lindsay S.C. Brinton*, Clayton, MO, and *Debra J. Albin-Riley*, Los Angeles, CA, of counsel.

*Emily M. Meeker*, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, with whom were *Robert G. Dreher*, Acting Assistant Attorney General and *Kristine S. Tardiff*, of counsel.

**O P I N I O N**

**FIRESTONE**, *Judge*

This "Rails-to-Trails" case deals with the creation of the "Highline" recreational trail in the City of New York ("New York City" or "the City"). Plaintiff Romanoff Equities, Inc. ("Romanoff Equities") claims that the United States ("the government") took its property interest in the elevated railroad right-

---

[*] The case caption has been changed to reflect the remaining plaintiff in this case. Further filings in this case shall be made under the remaining case number, No. 11-374. Previous filings were made in the lead case, No. 11-333.

of-way that is now part of the Highline when the Surface Transportation Board ("STB"), a federal agency, authorized the City to turn the right-of-way into an elevated park.  This court previously dismissed the claims of five other plaintiffs on the grounds that they had waived any right to compensation from the United States when they entered into Covenant Not to Sue Agreements with the City of New York in exchange for certain development rights alongside the Highline. West Chelsea Buildings, LLC v. United States, 109 Fed. Cl. 5, 28 (2013), aff'd, 554 F. App'x 942 (Fed. Cir. 2014), reh'g denied, petition for cert. filed.  The court also dismissed a sixth plaintiff, 437-51 West 13th Street, LLC ("West 13th Street, LLC"), for lack of standing when the facts established the subject property was owned by Romanoff Equities, a related company, at the time the alleged taking occurred.[1]  Id.  As the owner of the property encumbered by the easement at the time of the alleged taking, Romanoff Equities is now the only remaining plaintiff in the case.

Pending before the court are plaintiff's motion for partial summary judgment, ECF No. 94, and the government's cross-motion for summary judgment, ECF No. 99, filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  In its motion, the government argues that it did not take plaintiff's property because the easement provided by plaintiff's

---

[1] The alleged taking occurred on June 13, 2005.  Romanoff Equities transferred the property encumbered by the easement to West 13th Street, LLC on August 25, 2005.  At the time of the transfer, Michael Romanoff was the President of Romanoff Equities and Romanoff Equities became the sole owner of West 13th Street, LLC.  Michael Romanoff was and remains the manager of West 13th Street, LLC.

predecessor, the New York State Realty and Terminal Company, to the New York Central Railroad Company for an elevated right-of-way for rail traffic encompasses use of the property interest for a public trail and park. Further, the government argues that the easement was not abandoned by the railroad prior to the creation of the Highline. In the alternative, the government argues that, even if there were a taking, plaintiff is bound by the Covenant Not to Sue Agreement signed by Michael Romanoff, the owner of Romanoff Equities, as well as the manager of West 13th Street, LLC, plaintiff's successor in interest.

Plaintiff argues in its motion that the easement at issue does not extend to use of the property for an elevated trail and park and, as a result, the government committed a taking of plaintiff's property interest. Additionally, plaintiff argues that the easement had been abandoned before the creation of the Highline, at the time that railroad use of the corridor ended. Plaintiff further argues that there are genuine issues of material fact that preclude summary judgment on the issue of whether Romanoff Equities is bound by the Covenant Not To Sue Agreement entered into by its successor, West 13th Street, LLC.

For the reasons discussed below, the court finds that the easement granted by plaintiff's predecessor to the railroad encompasses any lawful use, including use of the easement for an elevated park such as the Highline. Further, the court finds that the easement had not been abandoned by the railroad. As a result, the government cannot be liable for a taking, and the court must deny plaintiff's motion and grant the government's cross-motion.

I.     STATEMENT OF FACTS

The following facts are not disputed unless otherwise noted.  In June of 1932, New York State Realty and Terminal Company granted an easement to the New York Central Railroad Company in consideration of one hundred dollars to allow for the construction and maintenance of an elevated railroad corridor in the airspace that has now become a part of the Highline.  Pl.'s Mot. P. Summ. J., Ex. A, at 1.  The Railroad Company acquired the easement "as part of a plan to eliminate dangerous railroad crossings at street level."  New York City Council, 4 A.D. 3d 85, 87 (N.Y. App. Div. 2004).  The Easement states in relevant part:

> [Grantor] does hereby grant and convey unto the Railroad Company, its successors and assigns forever, the permanent and perpetual rights and easements to construct, maintain and operate, without interference or right of interference, its railroad and appurtenances within those portions of the parcels of land herein described included between an upper plane and a lower plane drawn at the respective elevations herein provided for as to each such parcel, together with the exclusive use of the portion of the parcels of land herein described included between said plane for railroad purposes and for such other purposes as the Railroad Company, its successors and assigns, may from time to time or at any time or times desire to make use of the same, subject only to the permanent rights and easement herein specifically reserved to the [Grantor], its successors and assigns, in the portions of said parcels of land included between the said respective planes.

Pl.'s Mot. P. Summ. J., Ex. A.  Romanoff Equities acquired its interest in the subject property in 1999.  Am. Compl., Ex. K.  Through a series of conveyances, the easement conveyed to New York Central Railroad Company in 1932 was transferred to CSX Transportation, Inc. ("CSX"), effective August 24, 2004.  Am. Compl., Exs. C-D.  The railroad ceased operations in the mid-1970s.  Consol. Rail

Corp. v. Interstate Commerce Comm'n, 29 F.3d 706, 709 (D.C. Cir. 1994).  By 1982, Consolidated Rail Group ("Conrail"), then the owner, had removed the stations and tracks on the corridor.  Following that, various uses of the corridor were proposed, including a highway and a waste disposal service.  Id.  Neither of the projects were ultimately carried out.  Id.  In 1989, a group of property owners submitted a third-party application seeking permission for the railroad to abandon the easement, which Conrail opposed.  West Chelsea, 109 Fed. Cl. at 10; see also Chelsea Property Owners, 7 I.C.C.2d 991, 992 (1991), rev'd, Chelsea Property Owners, 8 I.C.C.2d 773, 794 (1992).  Those proceedings were completed in 1994 with a finding that abandonment was permitted if the property owners posted a surety bond, see Consol. Rail, 29 F.3d at 706, but no such bond was ever posted, West Chelsea, 109 Fed. Cl. at 10.

In response to those property owners, a community non-profit formed several years later under the name Friends of the High Line, Inc. and began advocating for the use of the corridor as a public park.  Id.  In 2002, New York City joined with that group to support a public park and entered into negotiations with the property owners, CSX, Conrail, and other parties to achieve that goal.  Id.  In those negotiations, both Conrail and CSX supported the issuance of a Certificate of Interim Trail Use ("CITU") to authorize rail banking and trail use for the elevated right of way for the purpose of creating a public park.  Def.'s Reply in Supp. Mot. Summ. J., Ex. 1 at 4, Joint Supplemental Statement ("[CSX and Conrail] have determined that a CITU is an appropriate mechanism to use for

the purpose of achieving the parties' objectives with respect to the High Line."). On June 13, 2005, the STB issued a CITU for the elevated right of way which has since become the Highline.  Am. Compl., Ex. H.  The City and CSX entered into a Trail Use Agreement on November 4, 2005.  Am. Compl., Ex. I.

At the time the CITU was issued on June 13, 2005, Romanoff Equities owned the property encumbered by the easement in fee simple absolute.  On that same date, Michael Romanoff, [ . . . ], formed a new entity named 437-51 West 13th Street, LLC.  Def.'s Mot. Summ. J., Exs. 2, 4.  Michael Romanoff [ . . . ]. Def.'s Mot. Summ. J., Ex. 1, Tr. 33:4-18.  Thereafter, on August 25, 2005, Romanoff Equities transferred the property encumbered by the railroad easement to West 13th Street, LLC.  Id. at 25:9-24.  The Real Property Transfer Report filed in connection with the transfer identifies the transfer as a "Sale Between Related Companies or Partners in Business" and states that "One of the Buyers is also the Seller."  Def.'s Mot. Summ. J., Ex. 2 at 30.  The Report identifies the assessed value of the property as $800,100; however, no monetary consideration was paid by West West 13th Street, LLC to Romanoff Equities for the property.  Id.

[ . . . ].  In December 2008, West 13th Street, LLC filed applications for zoning variances with the New York City Board of Standards and Appeals.  See Def.'s Mot. Summ. J., Ex. 3 at 1.  Although the property was not within the area rezoned by New York City in connection with creation of the Highline, West 13th Street, LLC eventually secured several zoning variances allowing for additional

retail use and greater floor area for the property than would have otherwise been allowed under the existing zoning.  Id. at 1-2, 6.

On May 15, 2009, Michael Romanoff, in his capacity as manager of West 13th Street, LLC, entered into a Release, Waiver, and Covenant Not to Sue Agreement with New York City, which stated that West 13th Street, LLC will not "sue or join any action seeking compensation from . . . The United States or any of its departments or agencies with respect to the Highline CITU."  Def.'s Mot. Summ. J., Ex. 6.  This agreement is identical to the agreements signed by the other property owners along the Highline, which this court in its prior opinion found to bar those plaintiffs from seeking compensation from the United States.  Id.; West Chelsea, 109 Fed. Cl. at 12.  West 13th Street, LLC also granted a separate easement to New York City granting it "the right to develop the Highline for Public Space, with reasonable access to the Highline across the property, with such right being a restriction in perpetuity . . . ."  Def.'s Mot. Summ. J., Ex. 2, Quitclaim, Consent & Easement.

Sometime after West 13th Street, LLC signed the Agreement and granted the easement to the City, West 13th Street LLC received the above-noted zoning improving the value of the property.  See Def.'s Mot. Summ. J., Ex. 3 at 1-2, 6.  In late 2010 or early 2011, [ . . . ] the property was sold to 860 Washington Street, LLC.  Def.'s Mot. Summ. J., Ex. 1.  The deed was signed by Michael Romanoff as the authorized signatory for West 13th Street, LLC.  Id.  The Real Property Transfer Report filed with New York City in connection with the transfer

identifies the "Full Sale Price" as $81,000,000.  Id.  The parties dispute the degree to which the Highline affected the value of the property, with plaintiff claiming that it would have been more valuable if it were not encumbered and the government claiming that it would have been much less valuable as it would not have received the same zoning adjustments.

II.   **DISCUSSION**

   **A. Standard of Review**

The standard of review when considering a motion for summary judgment is well-settled. The court's role is "to determine whether there is a general issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  It is not the court's role to "weigh the evidence and determine the truth of the matter."  Id. RCFC 56 provides that "[s]ummary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  RCFC 56; see also Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1371 (Fed. Cir. 2009).

   **B. The Easement Encompasses Use of the Easement for the Highline**

The Federal Circuit has explained that a taking occurs "when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." Ladd v. United States, 630 F.3d 1015, 1019 (Fed. Cir. 2010).  In Ellamae Phillips, the Federal Circuit identified a three-step inquiry to determine whether the federal government is liable to pay just compensation.  564 F.3d at 1373 (citing Preseault

v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996)). First, the court must determine "who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate." Id. Second, the court must determine "if the railroad acquired only an easement, were the terms of the easement limited for railroad purposes, or did they include future use as a public recreational trail (scope of the easement)." Id. Third, the court must determine whether, "even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple by the easement (abandonment of the easement)." Id. To resolve these issues, the court is required to apply state law. See Presault v. Interstate Commerce Comm'n, 494 U.S. 1, 20 (1990) (O'Connor, J., concurring) ("The nature of the property interest and the question of abandonment are routinely determined based upon state law."); Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 718 (2011) ("Because real property rights arise from state law, the extent of the plaintiffs' property interests in the right-of-way depend on the law of the state in which the property is located."). Here, applying New York state law to the issues presented, the court finds as follows.

    The government's liability turns on whether the subject easement is broad enough to encompass use of the easement for the Highline. If the easement is not broad enough to encompass the Highline, the court need not look further to find a taking. If the easement is broad enough to encompass the Highline, the court will

also be required to determine whether the easement was abandoned prior to the alleged taking.

We begin our evaluation with the language of the easement. Dowd v. Ahr, 583 N.E.2d 198, 200 (N.Y. 1991) ("Easements by express grant are construed to give effect to the parties' intent, as manifested by the language of the grant." (citing 2 Warren's Weed, New York Law of Real Property, Easements, §§ 3.02, 17.03 (4th ed.))). The subject deed states that it is to be used "for railroad purposes and for such other purposes as the Railroad Company, its successors and assigns, may from time to time or at any time or times desire to make of the same . . . ." Pl.'s Mot. P. Summ. J., Ex. A (emphasis added). Under New York law, the court's inquiry into a general easement must focus on what uses were contemplated when the easement was granted. Lewis v. Young, 705 N.E.2d 649, 660 (N.Y. 1998) ("express easements are defined by the intent, or object, of the parties" (citing Dowd, 583 N.E.2d at 911)); see also Phillips v. Jacobsen, 499 N.Y.S.2d 428, 429 (N.Y. App. Div. 1986) ("An easement granted in general terms must be construed to include any reasonable use to which it may be devoted, provided the use is lawful and is one contemplated by the grant." (emphasis added) (citing Missionary Soc'y v. Evrotas, 175 N.E. 523 (N.Y. 1931))). In addition, the easement "owner cannot 'materially increase the burden of the servient estate[] or impose new and additional burdens on the servient estate[] from that which was originally allowed. Gates v. AT&T, 956 N.Y.S.2d 589, 591 (2012) (alteration in original) (citations omitted).

Taking into account New York law, the court finds that the easement granted in this case was quite broad, and explicitly granted an easement "for railroad purposes <u>and for such other purposes</u> as the Railroad Company, <u>its successors and assigns</u>, may from time to time <u>or at any time desire to make use of the same</u>."  Pl.'s Mot. P. Summ. J., Ex. A (emphasis added).  Such terms clearly and unambiguously contemplate that the easement may be used for purposes beyond the railroad purposes for which it was initially used.  Further, as the easement authorized the Railroad Company's successors and assigns to use the corridor for "such other purposes as [they] may . . . desire," use of the corridor for a public park would by the plain terms of the easement appear to be clearly within the scope of the easement, absent evidence that the new easement is not lawful or imposes some significant new burden on the servient estate.  There is no question here that the Highline is a lawful project.[2]  Plaintiff has not made any allegation to support a finding that use of the corridor for the Highline will impose significant new burdens on the servient estate.  Moreover, having agreed to allow the Railroad, its successors and assigns to use the corridor for any lawful purpose, it is irrelevant that the parties at the time the easement was granted could not foresee use of the corridor for a public trail and park.  Regardless of whether the easement

---

[2] In this connection, plaintiff's contention that use of the property for a park would have been illegal while the corridor was used for railroad purposes does not make use of the easement for the Highline now illegal.  Regardless of whether third parties walking on rail tracks were potentially liable for criminal trespass under New York's penal code while the railroad was operating, now that the easement owner has converted the corridor to a trail and public recreational use, the penal code does not apply and use of the easement for walking is not illegal.

included numerous pages devoted to railroad-related issues, the easement grant contemplated by its terms was not limited to railroad purposes and the court cannot read that purpose into the easement. Rather, the easement by its terms recognized that other uses might be "desired" and explicitly permitted such uses so long as the uses fit within the physical specifications of the easement.

Unlike the cases cited by plaintiff to support its argument that the easement is limited to railroad uses, the easement in this case includes no language limiting the purpose of the use that may be made. For example, plaintiff refers the court to Ledley v. D.J. & N.A. Management, Ltd., in which the court found that a "very broad" easement was limited to "a right-of-way and [the ability] to pass and repass over the defendant's property." 643 N.Y.S.2d 675, 676 (N.Y. App. Div. 1996). However, the easement in that case did not include the open-ended grant that is at issue in this case, but rather provided only the "right to pass and repass over the right-of-way across the adjoining lands." Id. After reviewing the New York cases cited by the parties, the court finds that Missionary Society contains an easement that is most analogous to the one at issue in this case. In that case, the court found that "[t]he phrase 'for all other lawful purposes' compels an extension of defendant's right beyond the limits of ordinary passage by horses and vehicles of all kinds." 256 N.Y. at 90. More directly, the court found that, "[b]eing in general terms, [the easement] must be construed to include any reasonable use to which the land may be devoted." Id. at 89-90 (citing Jones, Law of Easements § 374; Abbott v. Butler, 59 N.H. 317 (1879)). In addition to finding that pedestrian

12

access was permitted, the court went on to find that the laying of water pipes was permitted as well.  Id. (citing Thompson v. Orange & Rockland Elec. Co., 254 N.Y. 366, 369 (1930).  Compared to Missionary Society, the language of the easement in this case is even broader.  As a result, the court finds that use of the easement for a public trail and recreation and for certain other associated activities fits within the broad scope of the subject easement.

In this connection, the court disagrees with plaintiff that allowing use of the easement for the Highline amounts to converting the subject easement into a fee estate, contrary to New York law.  The subject easement is limited by its express terms to "those portions of the parcels of land herein described included between an upper plane and a lower plane drawn at the respective elevations herein provided for as to each such parcel," which necessarily limit the scope of what can be done with the easement.  Pl.'s Mot. P. Summ. J., Ex. A.  Thus, while the terms of the easement are broad in terms of use, they are not limitless and the physical bounds set in the easement ensure that the subject easement is not converted to a fee estate.

Finally, the court disagrees with plaintiff that New York City's decision to obtain a new easement to explicitly incorporate the use of the corridor for the Highline as public space does not mean that the subject easement was not broad enough to encompass the Highline in the first instance.  First, the court is not bound by New York City's actions or its reading of the easement.  Second, as the government argues, there are plausible reasons for New York City to acquire a

new easement beyond the original easement that do not imply that it believed the easement to only permit railroad use. For example, it may have desired the easement because it believed that property owners were likely to sue irrespective of its interpretation of the original easement and wished to avoid such suits. Finally, New York City's decision to acquire new easements on top of the existing easements is simply irrelevant in considering whether the original easement encompasses use of plaintiff's easement for the Highline. New York City acquired the easement after plaintiff gave away his interest in the easement to West 13th Street, LLC and therefore the New York City easement has no bearing on this case.

In sum, the court finds that it is compelled by the plain language of the easement to agree with the government and finds that the subject easement encompasses use of the property for the Highline.

### C. The Corridor Was Not Abandoned Prior to the STB's Actions

Having determined that use of the easement for the Highline fits within the scope of the easement, the court now turns to whether the corridor had been abandoned by the railroad prior to the issuance of the CITU, in which case there may still be a taking. In order to demonstrate abandonment under New York law, a plaintiff must "establish both an intention to abandon and also some overt act or failure to act which carries the implication that the owner neither claims nor retains any interest in the easement." Gerbig v. Zumpano, 7 N.Y.2d 327, 331 (N.Y. App. Div. 1960) (citing Loening v. Red Spring Land Co., 94 N.Y.S.2d 568

(1949)). It is not enough to demonstrate "mere nonuse." Spier v. Horowitz, 791 N.Y.S.2d 156, 158 (N.Y. App. Div. 2005).

While there is no disagreement that the subject corridor was no longer being used for railroad purposes, there is no indication that CSX or Conrail intended to abandon its easement under New York law. As the easement is broad enough to encompass any use desired by the grantee, the cessation of railroad activities is not enough to demonstrate an intent to abandon. Instead, the burden is on the plaintiff to show that the easement holder had intended to relinquish any use of the easement. Here, as discussed above, CSX and Conrail both desired to make use of the easement following the cessation of rail use. Both railroads participated in negotiations regarding the creation of the Highline in support of the project and CSX continues to claim that it holds an interest in the easement. Def.'s Reply in Supp. Mot. Summ. J., Ex. 1 at 2-3, Joint Supplemental Statement (detailing the status of Highline negotiations in 2004, involving the City, CSX, Conrail, the property owners, and other parties). Further, prior to the conception of the Highline, Conrail sought to make use of the easement for a highway and for a waste disposal service and defended the easement against property owners seeking permission for abandonment in front of the Interstate Commerce Commission ("ICC"), a predecessor to the STB, from 1989 to 1994. See Consol. Rail, 29 F.3d at 706; Chelsea Property Owners, 7 I.C.C.2d at 992.[3] While none of

[3] In that proceeding, the ICC found that abandonment was permitted subject to the posting of a surety bond by the property owners. Chelsea Property Owners, 8 I.C.C.2d

Conrail's plans for usage of the easement were successful, they nonetheless demonstrate an intent to retain an interest in the easement and to find a potential use, as permitted by the easement.

In support of its argument that the easement was abandoned, plaintiff relies on several cases in which courts found abandonment at the cessation of railroad use, Presault, 100 F.3d at 1554, and Rogers v. United States, 101 Fed. Cl. 287, 295 (2011). However, those cases differ from the present case in important ways, as the findings of abandonment in both cases were based on elements that are not present in this case. In Preseault, the court found that an easement for railroad purposes was abandoned when the railroad tracks were removed. 100 F.3d at 1554. In this case, as discussed above, the subject easement authorized more than railroad use, making the function of the railroad tracks irrelevant. In Rogers, the court applied Florida law to find that the deed itself provided that the easement would be abandoned when it was no longer used for railroad purposes. 101 Fed. Cl. at 291, 295-96. In this case, no such language exists.

As plaintiff has not presented any evidence that the easement's grantee demonstrated an intent to abandon the easement accompanied by an overt act or failure to act, the court must conclude that the easement was not abandoned. Indeed, the record demonstrates the opposite, as both CSX and previous owners have played an active role in plans and proceedings involving the corridor. As a

---

773, 794 (1992), aff'd, 29 F.3d 706, 715; see also West Chelsea, 109 Fed. Cl. at 9-10. The ICC did not find that the corridor was abandoned, and the conditions required for abandonment were never met.

result, in such circumstances under New York law, the easement did not terminate prior to the actions of the STB.

## III. CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is **DENIED** and the government's motion for summary judgment is **GRANTED** with respect to the issues of the scope of the easement and the abandonment of the easement. The Clerk is directed to enter final judgment for the United States.[4]

**IT IS SO ORDERED.**

<div style="text-align: right;">
s/Nancy B. Firestone<br>
NANCY B. FIRESTONE<br>
Judge
</div>

---

[4] Having concluded that there was no taking, the court has no occasion to reach the government's alternative arguments.